GUARDIAN FOUNDATION v. TURNER.

No. 30723. June 30, 1942.

Rehearing Denied Oct. 6, 1942.

*129 P. 2d 592.*

Whitten & Whitten, of Oklahoma City, for plaintiff in error.

A. K. Little and Byrne A. Bowman, both of Oklahoma City, for defendant in error.

CORN, V. C. J. This is an action to recover damages for fraud. Verdict and judgment were for the plaintiff, and defendant appealed. The parties are referred to herein as they appeared in the original action.

The fraudulent transactions complained of were conducted by an agent of the defendant.

The plaintiff's petition states, in substance, that the defendant, the Guardian Foundation, is an Oklahoma corporation engaged in the business of sponsoring, promoting, and cooperatively financing for profit, funeral homes and businesses under a plan of selling service registrations or contracts, whereby the owners thereof could obtain from funeral homes operating under franchises granted by the Foundation, funerals at cost plus 10 per cent; and that the defendant had the exclusive right to grant such franchises for funeral homes in Oklahoma county and closely neighboring counties.

The fact that the plaintiff was defrauded out of $1,180 is not denied, and therefore is not an issue in the case. The only issue for determination is whether the defendant is liable for the fraudulent acts of its agent under the facts and circumstances of this case. That is, whether the agent had actual or apparent authority to induce the plaintiff to enter into the fraudulent contract by which his loss was sustained.

The record shows that A. Smith Nelson was the agent of the Guardian Foundation at the time of the transaction complained of, and for several years prior thereto, and was the person who conducted these transactions with the plaintiff.

At least a brief account of the negotiations which took place between plaintiff and Nelson is essential to a proper understanding of the case, as they reflect light upon the question of authority or apparent authority of Nelson to carry on such negotiations under cover of his connection with the Guardian Foundation.

On May 8, 1938, the plaintiff read an advertisement in the Daily Oklahoman which read as follows:

"WANT business manager for funeral business. We will train the right party. This is a permanent and profitable business. $1500 and an intelligent ambitious personality essential. You will be asked for and shown exceptional personal and business references. Write Box A-110, Oklahoman and Times."

The plaintiff wrote a letter to said box number expressing his interest in the funeral business, and in a few days a telephone call was received at his home in his absence, leaving a number and requesting that he call for Mr. Nelson at said number. Plaintiff called this number and someone answered "Guardian Foundation." He then asked for Mr. Nelson as directed, and Mr. Nelson talked to him over the telephone, and asked him to come to the Guardian Foundation office at 440 Commerce Exchange Building, Oklahoma City, for an interview. Plaintiff went to the office and was received by Mr. John Eldridge, who was in charge of the outer office. He introduced himself to Mr. Eldridge and told him the purpose of his call, and Mr. Eldridge told him that Mr. Nelson would see him shortly, and as soon as Nelson finished discussions with two young bond salesmen he took plaintiff into his private office and explained to him the Guardian plan of establishing and operating funeral homes. He told plaintiff that the Guardian Funeral

Home in Oklahoma City was a subsidiary of the Guardian Foundation, operating under the Guardian plan, and that it had made a sufficient success that the Foundation had decided to extend its operations out into new fields adjacent to Oklahoma county, and for that reason had run the advertisement in the newspaper for a manager for the new business. He explained the difficulty of getting established funeral homes to adopt the Guardian plan, and gave that as a reason for procuring and training managers without previous experience. He explained that the Guardian plan was a "cost plus plan" whereby the Foundation sold bonds and the purchasers of these bonds were entitled to a funeral at cost plus 10 per cent, and that there were two kinds of these bonds; a $36 bond and a $6 bond, one being for one year which, at the end of the year could be renewed and became a life bond after the payment of $36, and the other an "outright" bond for $36, which the customer could purchase for $31 cash payment.

An agreement was reached between Nelson and plaintiff for the establishment of a Guardian Funeral Home at Guthrie, to be operated by plaintiff under the Guardian plan and under a franchise from the Guardian Foundation.

Plaintiff paid, and was credited on the contract, $1,180, which amount included an automobile which was traded in on the contract at the value of $750. Nelson and plaintiff made several trips to Guthrie to procure a suitable location for the funeral home. Plaintiff arranged to pay the balance of the contract out of annuities which had accrued to him under employment with the Standard Oil Company of New Jersey as a boiler maker over a number of years.

In drafting the contract Nelson inserted his own name and the Guardian Shield as parties of the first part, instead of the Guardian Foundation, explaining to plaintiff that the Guardian Shield was a part of the organization known as the Guardian Foundation

and was the proper party to contract with. Nelson failing to make any progress in the establishment of the funeral home at Guthrie, plaintiff became dissatisfied and suspicious, and complained to Mr. Eldridge, an officer of the Guardian Foundation, and Mr. Eldridge took plaintiff to the office of Mr. Victor E. Harlow, president of the Guardian Foundation, and they refused to recognize the contract made by Nelson under the name of the Guardian Shield, and Nelson was called into a conference with the officers of the Guardian Foundation, and certain differences arose whereby Nelson severed relations with the Guardian Foundation and left the state with plaintiff's automobile and cash. The Foundation refused to carry out the contract or to restore to plaintiff the amount advanced on the contract, and plaintiff brought this action against the Foundation for the amount so advanced and for alleged consequential damages, amounting to $6,680. The verdict and judgment, however, limited recovery to $1,180, the actual amount advanced on the contract.

Nelson was the promoter of the Guardian system. He organized the National Guardian Foundation, the American Extension Press Association, publisher of the Guardian Shield, and the Guardian Foundation, an Oklahoma corporation, all having their headquarters in the same office in the Commerce Exchange Building in Oklahoma City. These organizations had different officers, but all were interested in the common objective of extending and expanding the Guardian system. They profited through the sale of bonds to patrons of the Guardian system and prospective customers of Guardian Funeral Homes, and by various services rendered to such funeral homes. It was addittedly a complex, co-operative scheme which led to confusion and litigation among its promoters.

It is difficult matter to determine from the record whether Nelson was acting within or outside the scope of his authority as agent of the defendant

316

in his dealings with the plaintiff. The establishment of a Guardian Funeral Home at Guthrie, or any other nearby city or town, came within the legitimate objectives of the local foundation, and undoubtedly it would have profited through services it would have rendered the funeral home under the Guardian plan, although it is not clear that it would have profited directly and immediately from the $1,500 which plaintiff had contracted to pay for the services to be rendered in setting up the establishment at Guthrie. The manipulations of Nelson in switching the contract to the Guardian Shield and himself as the first parties would indicate that he intended to claim this money as his own personal earnings, but since the business was to have been operated under a franchise from the Guardian Foundation, the Foundation would have benefited from its operation in the same manner as it does from any other Guardian Funeral Home under its jurisdiction. Apparently the disruption of relations between Nelson and the Foundation occurred over this irregularity in the contract. Since this action is based upon the alleged fraud of Nelson, the agent of the Guardian Foundation, which his said principal seems willing enough to admit, but of course denies responsibility therefor, it is not incumbent upon us to determine whether or not Nelson started out with the intention of perpetrating a fraud upon the plaintiff, or whether he started out in good faith, but was prevented from carrying out the contract because of the Foundation's failure to ratify the same. The result is the same. The plaintiff was induced into the contract by the agent and paid his money to the agent, and the agent absconded with it.

These facts present a strong case of apparent authority. Mr. John R. Eldridge, business manager of the Guardian Foundation, and in active charge of the office, knew that Nelson was working on this project with the plaintiff, and if there had been any objection on the part of the Foundation to the establishment of a Guardian Funeral Home at Guthrie, it was his duty to warn the plaintiff of the agent's lack of authority, and to do so before the plaintiff parted with his money and property. But, instead of that, these negotiations and transactions were permitted to be carried on in the office of the Foundation, and without doubt the plaintiff believed, and had no reason not to believe, that the agent had authority to set him up in business under a franchise from the Guardian Foundation, the defendant in this case.

The court instructed the jury that if the defendant, the Guardian Foundation, permitted Nelson to hold himself out to the public as its agent, clothed with the apparent authority to make contracts of the nature of the one made with plaintiff, or had knowledge thereof, and that the plaintiff in good faith, believing that Nelson had such authority, made said contract and parted with his money and property relying thereon, the plaintiff was entitled to recover from the defendant the amount and value thereof.

In Restatement of The Law of Agency, section 261, the rule is stated as follows:

"A principal who puts an agent in a position that enables the agent while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third person for the fraud."

This rule is applied in Berry v. Stevens, 168 Okla. 124, 31 P. 2d 950, and in Howe v. Martin, 23 Okla. 561, 102 P. 128.

2 Am. Jur., Principal and Agent, discusses the established rules as follows:

"Sec. 348. If an act done by an agent is within the apparent scope of the authority with which he has been clothed, it matters not that it is directly contrary to the instruction of the principal; the latter will, nevertheless, be liable, unless the third person with whom the agent dealt knew that he was exceeding his authority or violating his instructions. . . ."

"Sec. 354. The rule holding the principal liable on the contract made by his

agent within the actual or apparent scope of his authority applies notwithstanding that the agent, in contracting, acted in his own interests, and not in those of his principal, where the party with whom the agent deals has no knowledge of the agent's faults and is not cognizant of any fact charging him with knowledge thereof. The principal, having selected his representative and vested him with apparent authority, should be the loser in such case, and not the innocent party who relied thereon. . . ."

"Sec. 363. . . . Moreover, although the principal may not have actually authorized the particular fraudulent act, yet he is responsible for the fraud of the agent if he has intrusted to the agent a matter which puts the agent in a position to perpetrate the fraud complained of while the agent is executing the agency transaction within the scope of his employment. Even though the agent is committing a fraud for his benefit, the principal is liable therefor if it is within the actual or apparent scope of the agent's employment."

"Sec. 104. . . . This rule is based upon the principal that where one of two innocent parties must suffer from the wrongful act of another, the loss should fall upon the one who, by his conduct. created the circumstances which enabled the third party to perpetrate the wrong and cause the loss."

We are of the opinion that the facts and circumstances of this case justify and support the verdict and judgment herein, and that same should not be disturbed.

Judgment affirmed, and upon motion judgment is rendered against the sureties upon the supersedeas bond.

WELCH, C. J., and RILEY, OSBORN, BAYLESS, GIBSON, and DAVISON, JJ., concur. HURST and ARNOLD, JJ., absent.